LODGED
RECEIVED ___ COPY

DEC 2 3 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# United States District Court
## for the State of Arizona

| | |
|---|---|
| **Friends of Papago Park (FOPP)**<br>*Plaintiff*<br><br>– v –<br><br>**The City of Phoenix**<br>*Defendant*<br>**The City of Scottsdale**<br>*Co-Defendant* | **Case Number** _____<br><br>**CV20-02467-PHX-GMS** |

## Complaint and Request for Injunction

### I. Parties

#### A. Plaintiff:

**Friends of Papago Park (FOPP),** an unincorporated non-profit association of park users and visitors organized to preserve and protect the native habitat of Papapo Park in Phoenix, Arizona.  It has presence on both Facebook and a website, represented by

Lasse Norgaard-Larsen
122 E. Garfield St.
Tempe, AZ 85251
Telephone: 602-410-2343 (c)
Email: friendsofpapago@gmail.com Website: http://friendsofpapagopark.org
and
J. Arthur Deal
5936 E. Cambridge Ave.
Scottsdale, AZ  85257
Telephone: 602-695-5111 (c)
Email: jdeal@hotmail.com

#### B. Defendants:

**The City of Phoenix,** a Municipal Corporation (Defendant)
Mr. Cris Meyer
City Attorney's Office
200 West Washington Street, 13th Floor
Phoenix, Arizona 85003
Telephone: 602-262-6761   Fax: 602-732-2768
Email: cris.meyer@phoenix.gov.
and
**The City of Scottsdale,** a Municipal Corporation (Co-Defendant)
Ms. Sherry R. Scott
City Attorney
3939 N. Drinkwater Blvd.
Scottsdale, Arizona 85251
Telephone: 480-312-2405  Fax: 480-312-2548
Email: Sscott@ScottsdaleAZ.gov



## II. Basis for Jurisdiction

The following federal statutes, acts and/or provisions of the United States Constitution and US Congress are the foundation for this legal action:

- **US Constitution, Article IV, Section 3, Clause 2 (the Property Clause). "**Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State."
- **Land and Water Conservation Fund Act of 1965, Public Law 88-578 Title 16, United States Code §460l–4.** Statement of purposes: The purposes of this part are to assist in preserving, developing, and assuring accessibility to all citizens of the United States of America of present and future generations and visitors…. (3) No property acquired or developed with assistance under this section shall, without the approval of the Secretary, be converted to other than public outdoor recreation uses, unless such conversion is in accord with an existing statewide recreation plan and only if such substitution entails other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.
- **Federal Property Act, Title 40 United States Code §550(e).** (Sale of US Property for use as a public park).  Authorizes the Administrator of General Services, at his discretion, to assign to the Secretary of the Interior for disposal, such surplus property as being needed for use as a public park or recreation area. Deeds conveying any surplus real property disposed of under this authority shall provide that the property shall be used and maintained for the purpose for which it was conveyed in perpetuity and may contain such additional terms, reservations, restrictions, and conditions as may be necessary to safeguard the interest of the United States.
- **US Constitution, Article I, Section 10, Clause 1 (The Contract Clause).**  Prohibits States from enacting legislation relieving persons of their contractual obligations. This is the foundational principal establishing that a contract is a legally enforceable agreement between two parties that creates an obligation to do or not do particular things.  A restrictive covenant is a contractual clause in a deed of sale, a lease or other instrument of conveyance that limits the use of real property.

## III. Statement of Complaint

The Defendant and Co-defendant, in collusion, have allowed a corporation to illegally build an enclosed, private facility on public land, in a historic park, with terms and conditions that are disreputable and improvident. Although the terms of the contracts are irrelevant to the of the essence of this case – the illegal building of a private compound in a public park – they provide a backdrop that paints a picture of irresponsible management and perplexing decisions by city officials, contrary to the will of the people and to the principals of faithful stewardship expected of them. While this proposition may seem implausible to the average citizen, the Plaintiff has found that a proper combination of negligence, timidity, ignorance and arrogance can achieve the seemingly impossible.

The Defendant and Co-defendant are therefore in noncompliance with the terms and conditions found in all deeds, patents, certificates of sale or transfer, indentures and instruments of conveyance (herein referred to as the "Title Documents") relating to ownership of Papago Park. These require that Papago Park be used solely as a public park for recreational purposes. The defendants are also in violation of the Land and Water Conservation Fund Act (LWCF) as well as the Federal Property Act, using Papago Park lands for purposes other than outdoor recreation.  A breach of these covenants affects, by implication, inference and law, the aggregate area of Papago Park.

The object of this Complaint is a portion of Papago Park in Phoenix, Arizona, specifically the area at the Northwest corner of McDowell Road and 64th Street, at 1802 North 64th Street, Phoenix, 85008,

in and around the feature known as the Papago Baseball Facility (herein referred to as the 'Facility').

For more than one year, the representatives of the Plaintiff have been sending detailed and factual communications to public officials concerning events and activities at Papago Park which they believe to be illegal. These remonstrances have been fruitless. Public officials at all levels, including the defendants, have caused undue injury to the plaintiffs and public by ignoring contractual obligations, by disregarding their responsibilities, by their inexcusable reluctance to enforce statutory law, and even by providing erroneous information to Plaintiff, all of this resulting in giving a private party access and control of public lands in detriment to the public domain and contrary to the lawful duties of such officials. The representatives of the Plaintiff are private citizens with no legal background and limited resources who now seek redress in a court of law, having exhausted all simple, normal procedures to obtain satisfaction in this matter of dire importance.

The Plaintiff wishes to apologize for the length of this Complaint, but the verbosity is necessary to understand the surreal story of how – against all common sense and in defiance of a dozen laws and contractual obligations – a private facility came to be built in a public park. This story involves a series of communications and protests sent to local, state and federal authorities over a period of 14 months, most of which were ignored. Worse yet, as the Plaintiff repeatedly requested that this matter be investigated, authorities not only refused to perform their statutory duties but also ignored explicit laws relevant to this case. Unbelievably, authorities even cited repealed 'expiration date' legislation to justify their inaction, although they were aware said legislation had been voided, and then claimed the contractual 'park only' obligations had expired in 1985 when they were reaffirmed in land patents issued for Papago Park by the US in 1997. Incredibly, the Plaintiff was also discouraged by these same authorities from taking legal action in this matter of public interest.

This case, because of its labyrinthine nature and unusual entanglement of local, state and federal agencies, is complex, but also interesting. It could be a major case of national significance. Add to that the fact that Papago Park has a fascinating history unlike any other park in America and that the financial impact of a decision may easily be in the tens of millions of dollars, one gets a sense of how relevant this case is to the people and judicial institutions of the United States of America.

**III.A. Legal Standards and Determining Factors**

The Plaintiff understands that it is a settled point of law that a party seeking an injunction must demonstrate (1) irreparable harm in the absence of the injunction, (2) a likelihood of success on the merits of litigation, (3) that the balance of hardships is decidedly in the movant's favor, and (4) that the case is in the public interest. Therefore, the Plaintiff seeks judicial relief based on the following factors:

**Likelihood of Irreparable Harm**

The absence of an injunction and the denial of a favorable settlement for the plaintiffs in the terms of the law will signify a removal of a large area of a land, hitherto dedicated by law for recreation and enjoyment, from the public domain for a period of time extending far beyond the lifetime of the plaintiffs, perhaps forever, given the renewal clauses. It will also create a previously inconceivable and dangerous precedent in which federal laws pertaining to parklands and related grants or restrictive covenants can be disregarded at will. Finally, if unchallenged, the devastation of desert flora and fauna and construction of a private facility in Papago Park may lead to similar abuses in other areas of Papago Park, or even other parks.

**Likelihood of Success on the Merits**

The basis for this claim is threefold:

1. The overwhelming quantity of laws, acts and legal codes passed by the Congress of the United States of America that emphasize the unique nature of public parks, and the government policies established to protect and preserve their use for public enjoyment and recreation, *in perpetuum;*

2. The record of litigation in federal and state courts relating to misuse and attempted divergence of

use from that typical of a public park. Although some of these alternate uses proposed were good or even noble – schools, roads, daycare centers, redevelopment of deteriorated areas – all these changes of use were denied by Courts based upon legislation and land use covenants. The Plaintiff could find no case in which a public park was allowed to be converted to other uses if challenged by citizens; and 3. The more than five Title Document issued by the United States Government or the State of Arizona over a period of more than sixty years, which contain deed restrictions that clearly and unambiguously state that Papago Park lands are to be used for "municipal, park, recreation or public convenience purposes" and "park only". As a general principal, restrictive covenants are always held up in courts, unless they violate civil rights laws or if there is a prior history of them being disregarded in a particular property or similar properties nearby. Neither is the case for Papago Park.

### Inadequacy of Monetary Damages

The loss of a significant area of historic park lands, with its botanical and geological features, is irreparable given the unique nature of the land and its location in the very center of the Metropolitan Phoenix area. The loss of natural desert lands is an ongoing public issue in Arizona due to the exponential population growth and consequent urbanization. The desert landscape that had characterized the Valley of the Sun since pre-State times (1912) is rapidly disappearing and cannot, in any manner, be replaced by comparable properties, since there are none, nor by monetary damages, since the visual enjoyment of desert landscapes and the pleasures of walking in its unique flora, fauna and geological features are priceless and defy economic expression.

Note that, as for the inadequacy of potential financial remedies, it is understood that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute (*TR Petroleum, LLC v. Sunoco, Inc.,* No. 07-CV-475, 2008).

### Balance of Equities and Hardships

The benefit to be derived from a favorable judgment for the Plaintiff in this case is the reaffirmation of the validity of laws, and the preservation, protection, and the net increase in the quality of public outdoor recreation facilities and resources which are available to the people of the State of Arizona and the United States, and such benefit exceeds to an immeasurable and unascertainable extent any losses suffered by the defendants and their client, which may eventually be recovered by other means and different economic mechanisms.

Any claims by the cites of Phoenix and Scottsdale, or a client, regarding the financial harm caused by any injunction that might impede their ability to meet obligations *vis-à-vis* contractual terms, is, in the final analysis, primarily one of Defendants' own making, occurring because of their decision to execute the arrangement on lands known to be public and known to have prohibitory covenants.

As in the case of Friends *of the Shawangunks, Inc. v. Clark* (Case 9, below) "When one undertakes to develop for private purposes a project involving the use of lands encumbered by a government interest, one's expectations are, or should be, that a certain amount of process and expense will be involved; presumably the anticipated rewards offset the cost and hassle." It is difficult to imagine that no one considered the risks of using public lands when building a private facility, but it is certain that, for the defendants and their partner, the potential benefits (negligible cost, prime location) and perceived official protection (city sponsorship and complicity) far outweighed any risk of public reaction, backlash or legal challenge.

### Public Interest

There is an obvious public interest in having a Court of Justice consider and render judgment on matters of law pertaining to the preservation of assets in the public domain, to uphold federal laws, to insure that contractual obligations relating to land use are respected, to require government agencies to execute their responsibilities as defined those laws, and finally, to confine local government agencies

to actions that are within the limitations of local laws and policies to which they are subject.

It is the official policy of the US Government to make a sustained effort to protect natural areas. In consequence of the *Citizens to Preserve Overton Park, Inc. v. Volpe* decision (case 10 below), the United States Code was amended to read "It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites".

The construction of a private facility in a park is also a serious violation of the Public Trust Doctrine (PTD). This is a legal principle based on the proposition that the sovereign (or state) holds certain properties in trust in perpetuity for the free and unimpeded use of the general public. This doctrine requires that, first, property subject to the trust, such as parks, must be available for use by the public; second, the property may not be sold, even for a fair cash equivalent; and third, the property must be maintained for particular types of uses. Under the doctrine, governments are not only prohibited from conveying trust resources into private hands, they "have an affirmative, ongoing duty to safeguard the long-term preservation of those resources for the benefit of the general public" (*The Public Interest Doctrine*, by David L. Callies, 44). See also *Ariz. Ctr. for Law in the Pub. Interest v. Hassell* (172 Ariz. 356) for a detailed discussion of Public Trust Doctrine.

It is important that this case – about the utter disregard of law and policy relating to lands in the public domain – not be ignored, or worse, be cited as judicial precedent relevant to other cases seeking to justify the appropriation of public park lands for uses different from those initially conceived and for purposes other than recreation and leisure.

### III.B. Factual Background

On November 26, 2018 the Defendant, identified as the City of Phoenix (Phoenix), owner of Papago Park, signed a lease (the Lease) giving use of that Facility to the Co-Defendant, the City of Scottsdale (Scottsdale).  On December 1, 2018, Scottsdale signed a sublease (the Sublease) giving use of that Facility to the San Francisco Giants Baseball Club, LLC, (the Giants) and allowing the Giants to make "certain improvements" to the Facility for use as a training compound for a Player Development Program. The Sublease was made with the knowledge and acquiescence of Phoenix. The joint legal maneuver among these three entities for building of the Facility is called herein 'the Arrangement'.

The Lease and Sublease of Facility land and subsequent construction of an enclosed, restricted-access baseball training compound for a private corporation is in direct violation of all deed restrictions in all ownership Title Documents for Papago Park, which specifically state that Papago Park lands are to be used for "park and recreational uses", for a "city park only" and "municipal, park, recreation, or public-convenience purposes".  The deviation from the intended use as a park is also a violation of Title 40 United States Code §550(e) (Disposal of real property for certain purposes) and a breach of the obligations set for forth in the Land and Water Conservation Fund (LWCF) Act, Public Law 88-578, requiring that no property acquired or developed with assistance under that section shall be converted to other than public outdoor recreation uses without the approval of the US Secretary of the Interior.

### III.C. Evidentiary Exhibits

To understand this operation, its structure and contractual conditions, the following documents are attached:

- **Exhibit A – Lease from Phoenix to Scottsdale** (Contract 2018-201-COS). This contract contains the necessary information needed to ascertain the basic structure of the agreements and even the illegal nature of the operation. The Full Lease is a 172-page document, of which pages 1-26 constitute the Lease itself (clauses and conditions) with authorization for Sublease to Giants. Pages 27-36 contain exhibits relating to area in the lease (legal descriptions and diagrams). The Sublease, From Scottsdale to the Giants, for the most part document mirrors the Phoenix to Scottsdale Lease, with minor variations.

- **Exhibit B – Title Documents**. These are copies of deeds, titles, patents, statements and certificates relating to ownership and use of Papago Park. These are included in the full Lease as Exhibit F (pages 37-54) but herein presented separately because of their importance:

  1937 Land Grant and Patent of Transfer to Arizona (pages 37-39)
  1959 Certificate of Approval of Transfer and Change of Use (pages 40)
  1997 Land Patent and Transfer to Phoenix (pages 41-43)
  1964 Deed of Sale (Arizona to Phoenix) and permitted leases (pages 44-49)
  1959 Certificate of Purchase (Phoenix) (pages 50-54)

  The above are collectively referred to herein as the 'Title Documents.' The full Lease also contains the 130-page 2010 Master Plan for Papago Park, referred therein to as Exhibit G (pages 55-166). This is not included here for sake of brevity.

- **Exhibit C – Timeline for Papago Park**. A listing of important events presenting the fascinating history of this most unusual and scuffled of public parks.

- **Exhibit D – Selected emails** to public authorities regarding events at Papago Park. The emails are attached to this case to provide factual content and a history of communications to and from public officials about the baseball facility project. These emails substantiate the following:
  a. the many attempts to call attention to the possible illegal nature of the lease contracts and building of the Facility,
  b. that most such warnings and requests for action were ignored, or when a response was given, such was labored and peripheral,
  c. the inexcusable reluctance to enforce not only statutory law, but even basic city park policy,
  d. that erroneous information was provided by authorities to justify their inaction, and
  e. the devastation inflicted on the desert habitat of Papago Park over recent years, not just in consequence of the building of the Facility, but in other areas, as a consequence of what can only be described as a "It is just dirt" mentality.

  The emails, presented in chronological order, are almost all public records. In some cases, emails have been edited for brevity and some personal non-government names have been redacted. The full content of any email is available, as are many other emails relating to this case. Attached pictures are included with the text.

**III.D. History of Papago Park**

Papago Park was established as Papago-Saguaro National Monument in 1914 (Proclamation No. 1262, under the Antiquities Acts of 1906) by President Woodrow Wilson, citing a significant collection of biological, geological, archeological and scenic values. In 1930, under pressure from local politicians and commercial groups, the US Congress removed the National Monument designation and in 1937 President Franklin D. Roosevelt signed a decree transferring land ownership from the federal government to the State of Arizona, with "the express condition that the lands so granted will be used for municipal, park, recreation, or public-convenience purposes".

For decades Papago Park, due to its presence at the very center of all major urban areas around Phoenix, was a destination for outdoor recreation and appreciation of desert landscapes, particularly around the Hole-in-the-Rock, the Park's most famous geological landmark and a visitor favorite. The Park also contains one paleontological and twenty-seven archaeological sites, as well as more than a dozen historical buildings. Papago Park was also, for a few years, the location of what was arguably the most famous prisoner of war (POW) camp in modern American history. Note that parts of the baseball Facility were built over former POW campgrounds.

In 1959, the transfer of Papago Park lands from the State of Arizona to the City of Phoenix was approved by the Bureau of Land Management (BLM) "for use as a park, recreation, public-convenience purposes." In an indenture (deed) signed in 1964, Papago Park was formally sold by the State of Arizona to the City of Phoenix subject to "certain reservations, restrictions, and conditions" contained in the

1937 Land Grant and Patent from the United States of America. That document declares that "this patent is issued on the express condition that that the lands so conveyed shall be used only for park, recreation, public-convenience purposes." The 1964 Deed also declares Papago Park subject to the following seven leases: Arizona Fish and Game (now the Zoo), Salt River Project, Arizona Highway department, City of Tempe, Arizona Cactus and Native Floral Society (now the Botanical Garden), United States Army, and existing Highway Rights of Way.  All these entities still exist and continue to occupy lands in Papago Park. There is no mention of any power to sublease, implicit or explicit.

  During the negotiations for the sale of Papago Park to Phoenix, in the late 1950s, the idea of building a baseball stadium in the Park was raised by the business community. Both the 1959 and 1964 documents authorize – and limit, under "Municipal use" – the building of a stadium for commercial baseball enterprises and other facilities essential to the health, safety and welfare of the park visitor. This stadium was later built at the Southwest corner of Van Buren Street and Gavin Parkway, and is currently used by Arizona State University. The inclusion of a baseball stadium was characterized as a "change of use" and was approved by the US Secretary of the Interior.

  In the 1997 Land Patent, the United States of America again confirmed the conveyance to Phoenix "for a City Park only" and added that the grant of the lands described is also subject to the terms of Title VI of the Civil Rights Act of 1964. That same document prohibits, once again, the "patentee or its approved successor to attempt to transfer title to or control over the lands to another, the lands have been devoted to a use other than that for which the lands were conveyed, the lands have not been used for the purposes for which they were conveyed".

  Today, over a century after it was established as a National Monument, Papago Park is the best known and most visited park in Central Arizona. It is also one of the most scenic and easily accessible desert areas in Greater Phoenix, where Tempe, Scottsdale and Phoenix meet, making it extremely accessible from all parts of the metropolitan area. The park's 1,500+ acres are filled with rolling hills, over 10 miles of hiking and biking trails that showcase the famed saguaros and other cacti, picnic areas, and lagoons. The park is also home to attractions including the Desert Botanical Garden, the Phoenix Zoo and the Arizona Heritage Center. It is not much of an exaggeration to say that Papago Park is to the Phoenix Metropolitan area what Central Park is to New York City or Balboa Park to San Diego.

  Sadly, every year the desert portion of Papago Park is reduced. In the mid-1950s, perhaps 90% of the non-military area of the park was still undisturbed Sonoran Desert. Since then, in the last ten years, this remnant portion of desert areas has been diminished by the many capricious projects done by the City of Phoenix, of which the most destructive and blatantly illegal has been the building of a training compound for a private corporation (valued at US$ 3 billion, according to Forbes). In the 2010 Master Plan, prepared by Phoenix, only 34.4% of the park is classified as protected desert.  The designation "protected" in that document is a misnomer – it can be changed at will. In August of this year, nine more acres of "protected" landscape was turned into an unneeded parking lot for the Zoo by a simple administrative decision.

**III.E. Plaintiff's Efforts for Propitiation and Conciliation**

  Starting in late 2019, as the construction of the Giant's Facility began, park visitors and neighbors began to question the purpose and legality of that facility (see emails in Exhibit 4, starting in October 2019), believing that they were misled as to the true such nature and extent of that project. Hundreds of emails were sent to city officials in Phoenix and Scottsdale, with little consequence. Efforts were made to reach out to government officials at all levels, also with few results.  Letters and emails were sent to both Senators and a US Representative asking for them to contact the Department of the Interior(DOI)  and request an investigation into possible violations of land use covenants. More emails were sent to different agencies of the Department of the Interior, including the Bureau of Land Management (BLM), National Park Service (NPS), the OIG and the Office of the Solicitor of the DOI (herein afterwards simply the 'Solicitor') reminding them of their responsibilities under the law. These

produced a limited exchange of communications, but no action other than an obvious eagerness by officials to neglect their duty and to distance themselves from anything relating to Papago Park. As one FOPP member said, "nobody wants to mess with the big guys", possibly referring to the large municipal organizations involved in this suit.

Finally, after a series of urgent emails pleading for action and a semi-ultimatum 'do something or we will file an injunction and all hell will break lose' sent on October 22, the Solicitor sent a statement (Exhibit 4, email of October 26) saying "the US Government no longer has any property interest in the area ... because that interest had expired on December 31, 1984 and therefore *the United States no longer plays a role in determining the use of the land, and moreover, Nor will the land revert to the United States because of actions taken by the current owner*", citing the terms of an attached Certificate of Approval of Transfer and Change of Use (Certificate No. 4) dated January 1, 1960, which says "this approval is subject to the reversionary provisions of the above noted Act (i.e., of June 14, 1926 and 44 Stat 741, as amended) terminating 25 years from January 1, 1960." The Plaintiff had not seen this document, but it is similar to the one of the same name in the Title Documents (Page 40), which is No. 1, dated April 28, 1959.

This is a grievous legal error. In an email response to the Solicitor on October 29 (see email) the Plaintiff points out that it has always been federal policy that parks lands dedicated for public use be maintained for public use, and that the 1954 Recreation and Public Purposes Act, a revision of the 1926 Act, makes it clear that park lands conveyed to states and municipalities must have restricted 'recreation only' titles and that the lands must be used in perpetuity for the purposes they were acquired – that is, parks, not private sports compounds.  To add insult to injury, the Plaintiff pointed out that the 25-year expiration clause, upon which the Solicitor based its opinion, had been repealed by Public Law 86-292 of Sept 21, 1959.  Therefore, the expiration clause had already been repealed <u>before</u> it was included in the Certificate of Approval of Transfer and Change of Use (Certificate No. 4), dated January 1, 1960, a document then used by the Solicitor's office to ignore the law and their responsibilities.

It gets worse – On November 6. the Solicitor's office again replied (see email) saying *"The Act of June 4, 1954 (68 Stat. 173), provided for the 25-year limitation on the reversion clauses of previously issued patents. Because the patents for Papago Park were issued prior to this time, the 25-year limitation on reversion applies to the transfer of title/change of use certificates. It would not be until 1959 that Congress would again change the statute to abolish the 25-year reversion for all future patents."* There are four glaring problems with this position: 1. There is no "saver clause" in the repeal. A saver clause in a statute exempts something from the statute's operation or provides that of it will stand if part is held invalid. In simple terms, a repeal without savings eliminates the repealed statute or item of a statute completely, including for all prior legislation.  2.  The word "future" is not in the text of the abolishing clause.  The expiration is repealed, simply, as if it never existed. 3. The Certificate of Approval of Transfer and Change of Use (Certificate No. 4), used as the basis for its argument by the Solicitor, was itself issued after the repeal, and 4. In the 1964 Deed and 1997 Land Patent, these same restrictions and provisions were once again reaffirmed.  So, in fact, the use restrictions and reversionary provisions for Papago Park are as valid today as they were in 1932, 1959, 1964 and 1997, and by inference, the US Government does have a property interest in the area. In their response, Solicitor's office indicated that we should contact the Arizona State Parks Board, the agency that has designated authority to represent and act for the State in dealing with LWCF matters. This was done on November 11 (see email), but, as usual, more than one month has passed and no response has been received from that agency.

After more than one year of frivolous posturing and willful procrastination by all parties contacted, the Plaintiff has decided to seek a judicial remedy.  This was not its initial intention, but the Plaintiff believes that, having done everything possible to raise the issues and reach an agreement to mitigate the damages being done to Papago Park, a hearing and judgment in a court of law is the only

forum suitable to address and resolve these important issues.   In the opinion of the Plaintiff, the communication from the DOI was cursory and deficient because the document presented and used for that opinion does not reflect a true cognizance of relevant legislation and subsequent amendments, the nature of the transfer of title, or even other protective legislation relevant to Papago Park. The position taken by the Solicitor is just one more case of officialdom demonstrating an unwillingness to get involved in a suit that may be tortuous and financially significant, involving major municipal entities with appreciable human, financial and legal resources. On the other hand, the public – the people – with whom the FOPP organization has spoken unanimously view the building of a private compound in a public park to be wrong, although many add the refrain "yes, but this is Arizona, and the developers and commercial interests always do what they want." Not always, we hope; not in this case.

In simple terms, for the Friends of Papago Park, this is a case that will determine if an area understood to be a public park for more than one hundred years is really a park, or if it is just an area of land owned by a municipality subject to unrestricted use, available for commercial enterprises under advantageous terms. This case will also decide if title covenants are valid legal measures to restrict land use, and finally, if presidential proclamations, United States legislation and Acts of Congress have any weight on matters of public concern, or if these can be disregarded at will by officials and lawyers at city, state and federal levels without considering public interest, legislation or moral obligations.

Therefore, having exhausted all options, after dozens of attempts were made (see emails in Exhibit 4) to reach an understanding with the cities of Phoenix and Scottsdale, the Plaintiff has decided to file this Complaint and Request for Injunction *pro se*, although *pro bono* representation by a qualified lawyer would be greatly appreciated. As a final note, although the Plaintiff, due to economic conditions, does not have the benefit of legal representation, it believes this case is fascinating, given the unique history of Papago Park, the variety of judicial concepts encompassed and the multitude of legal players involved in its history over a century of time. While it shares many similarities with other court cases relating to misuse of parks and former lands belonging to the US Government (in all of which, by the way, the deed and LWCF restrictions were held valid), it also offers singular challenges that make it unique and which may impact future case studies.

At this point, the Plaintiff decided it was futile to pursue matters with governmental entities with legislative and executive powers, given that they had no interest in enforcing the law, doubtless because of – for lack of a better word – the 'mess' that a law suit could become. The Plaintiff even sympathizes with that attitude and wishes there had been another path to resolve the issue.

### III.F. Judicial Precedents

The following citations are relevant legal precedents that substantiate the positions taken in reference to this action. The circumstances in each case are all apposite in some way to the issue at hand and the laws, acts, statutes and legal concepts expounded therein are applicable to this case.

- **(Case 1) *H.R. 2288 and H.R. 954*.**
  In 1989, the National Park Service conveyed a 3.03-acre surplus property, at no cost, to Rockingam County, Virginia, under the terms of the National Park Services Federal Lands to Parks Program, with the required deed restrictions. In 1990, the City desired to use part of that land for non-profit Plains Area Day Care Center, which provides affordable childcare for nearly 100 children. Deed restrictions, however, prevented the use of the land for that purpose.  To resolve this, so that improvements and repairs could be made to the facility, Congress passed legislation to remove deed restrictions from an approximately 1-acre portion of the property, while the other 2 acres would continue to be subject to the existing deed restrictions and reversionary clauses. It takes a law to remove federal deed restrictions.

- **(Case 2) *Save the Park and Build the School (SPBS) v. National Park Service.*** 
  In 2019, the Cardiff School District in Encinitas, California began a partial demolition of its existing facilities and the construction of new ones. The project area included part of Berkich Park, a

small community park adjacent to it, also owned by the school district. Local residents, unhappy with the partial loss of their park, formed an association called "Save the Park and Build the School" (STPBTS) and filed two suits to halt construction, claiming the project was not a mere "modernization and reconstruction Project" but actually a demolition and new construction of most of the school, entailing a significant loss of sports fields and grass parklands.  A key element of the suit was that, in 1995, federal funding was used to enhance Berkich Park under the Land and Water Conservation Fund (LWCF) Act, which required that parks receiving LWCF funds be maintained for public outdoor recreational use in perpetuity. That legislation did allow replacement and conversion of other lands for "other recreational properties of at least equal fair market value and reasonable equivalent usefulness and location". A flurry of legal activity ensured, leaving the community "reeling from legal whiplash", according to national news articles. The National Park Service (NPS) was enlisted to find replacement areas, choosing a partially paved area for this purpose. STPBTS rejected the equivalence proposed, saying "Basic common sense belies the conclusion that a paved parking lot serves a reasonably equivalent recreational use as grassy parkland where children can play, and families can picnic on warm sunny days." NPS rescinded the boundary adjustment.

On Sept. 11, U.S. District Judge Larry Burns said the public interest in upholding federal law (protecting the Park) outweighed its interest in returning to in-person classes. The District was ordered to pay $500,000 for legal fees incurred by STPBTS.  The District stated it incurred another $850,000 on attorney's fees without a win in either Superior Court or State Appellate Court. In this case, even though the school owned the land and there were no deed restrictions, the fact that LWCF funds had been used to enhance the park meant it could not be used for any other purposes except outdoor recreation. The School/Park legal battle is ongoing and unresolved. In the Fall of 2020, children were using temporary buildings as classrooms.

- **(Case 3) *Smith v. City of Westfield*** (278 Mass. 49, 2017)

This case is like that of Cardiff above. A trial court had issued an injunction prohibiting construction of the new school on park lands until the city complied with applicable state and federal law. In subsequent proceedings, however, the court found Article 97 of the Massachusetts Constitution would not protect Cross Street Playground from diversion absent a "recorded instrument" in the land records, indicating the land was specifically "taken or acquired for conservation purposes." Since no recorded instrument had designated use of the Cross Street Playground "as a playground or for any other recreational purpose," the trial court ultimately concluded "the parcel was not protected" and vacated the injunction against the city. Upon appeal, the state Supreme Court vacated the judgment of the lower courts. In the opinion of that Court, parkland would be protected without a recorded deed restriction "where there is a clear and unequivocal intent to dedicate the land permanently as a public park and where the public accepts such use by actually using the land as a public park." While the recording of a deed or a conservation restriction was one way of manifesting the required intent, the court acknowledged "it is not the only way". According to the ruling, once land is permanently dedicated for such use to the benefit of the general public, the public obtains an interest in the land, which is "irrevocable."

The court also cited a 1979 LWCF grant to rehabilitate Cross Street Playground. In consequence, the State Supreme Court found that "The restrictions imposed by the Act on the management of land acquired or developed with LWCF funding remain in full effect over the Cross Street Playground and that the city had surrendered all ability to convert the playground to a use other than public outdoor recreation without the approval of the Secretary" (16 U.S.C. § 460l-8(f)(3)).

- **(Case 4) *Oregon & California R. Co. v. U.S.*** (238 U. S. 393, 1.36, 4.38, 1915)

This was a rather long and complicated legal case by the United States Supreme Court involving land grants, settlement and abuses.  In the late 1800s the US Government had given large tracks of land to private companies which, when sold, would finance railroad construction.  In time, it was

noted that while some lands were settled, large amounts lands were either unsold or had been purchased in large quantities by commercial entities for resale, in quantities far exceeding the 160-acre maximum limit. In consequence, Congress adopted a joint resolution (35 Stat. at L. 571) which authorized and directed the Attorney General to institute and prosecute any and all suits in equity, actions at law, or other proceedings, to enforce any rights or remedies of the United States, and to claim lands granted by such acts, or any part of the lands, have been or are forfeited to the United States by reason of any breaches or violations of the terms or conditions of either of such acts which may be alleged or established in such suits, actions, or proceedings. Quote: "Acts of Congress granting lands are laws as well as grants, and are operative until repealed; the fact that the conditions imposed in the grant were not applicable to the character of the lands furnishes no excuse for antagonistic action, even though it might justify nonaction pending further legislation. The delay in the assertion of a right is not conclusive against its existence..."

- **(Case 5)** *Cohen v. City of Lynn* (33 Mass. App. Ct. 271; 598 N.E.2d 682, 1992)

  In this case the City of Boston conveyed land to a private developer because it claimed the parcel was too small and "no longer usable for park purposes." Plaintiffs claimed the conveyance violated the city's obligations under a public charitable trust which they claimed arose in 1893 when the parcel was acquired by deeds which stated the land was to be used forever for park purposes.  As noted by the Appeals Court, in 1991, the park commissioners had wanted to acquire "more open air space" for park purposes, which were defined as follows:  "The term 'park' usually signifies an open or inclosed [sic] tract of land set apart for the recreation and enjoyment of the public; or, in the general acceptance of the term, **a public park is said to be a tract of land, great or small, dedicated and maintained for the purposes of pleasure, exercise, amusement, or ornament; a place to which the public at large may resort to for recreation, air, and light**" (Emphasis of court). Applying this definition to the facts of the case, the Appeals Court rejected the City's contention that "the parcel is too small to serve park purposes."  As noted by that Court, "property conveyed to a governmental body for particular public purposes may be subject to an enforceable general public obligation or trust to use the property for those purposes. Whether a trust or obligation is imposed is a matter of interpretation of the particular instrument and determination of the donor's intent and is to be ascertained from a study of the instruments as a whole in the light of the circumstances attending their execution."

  According to the Court, "conveyances of land for parks, where the grantors specified the land be used 'forever' or 'in perpetuity' without other limitation, have been found to establish a public charitable trust.  Accordingly, the Appeals Court found the trial judge had "correctly concluded that a public charitable trust arose from these conveyances and that the acceptance of deeds by the city" which "constituted a contract between the donor [of the land gift] and the donee [City] which must be observed and enforced." The Court went on to note that "the contract obligations arising from a charitable trust such as exists in the present case cannot be impaired legislatively." The sanctity of such a contract is under the protection of Art. 1, §10, of the Constitution of the United States.  The policy of the Commonwealth has been to add to the common law inviolability of parks express prohibition against encroachment... The firmly settled and frequently declared policy of the Legislature heretofore has been to preserve public parks free from intrusion of every kind which would interfere in any degree with their complete use for this public end. It cannot be assumed that this policy is to be lightly thrown aside." The Appeals Court, therefore, affirmed the judgment of the Trial Court which had held the terms of the public charitable trust prohibited the City from conveying the park parcel to a private developer.

- **(Case 6)** *Dunphy v. Commonwealth* (368 Mass. 376; 331 N.E.2d 883, 1975).

  The town of Rockland, Massachusetts had authorized the construction of an artificial ice skating rink on land conveyed to the town in 1917 with the stipulation in the deed that the land was "to be kept and used as a Public Park in perpetuity for the public good..." In 1972, legislation authorized

the town to convert Reed Park into an ice-skating rink to be named Reed Rink. The plan included a building, parking spaces and driveways, and some trees that would be left on three strips of land.

In this case the trial judge ruled that the preservation of a token number of trees does not change the situation. The public at large will no longer use [it as a] park. Skaters will use it. The appeals court agreed. In the opinion of the appeals court, "the use of the land for the erection and operation of the proposed skating rink building and related facilities would constitute a violation of the terms and conditions of the trust to which the land is subject." As noted by the appeals court, the town had taken title to Reed Park "as trustee under a public charitable trust requiring it to use the land for a public park in perpetuity." The town in taking title to the Reed Park land assumed obligations and must now comply with them. It is not within the power of the Legislature to impair those obligations by legislation, and St. 1972, c. 89, does not validate the diversion of the property from public purposes to other uses and purposes. As a result, the appeals court ordered the land "be kept and used as a Public Park in perpetuity for the public good in accordance with the terms of the deed of the grantor to the town dated April 4, 1917."

- **(Case 7)** *Brooklyn Heights Association (BHA) v. National Park Service (NPS)*

    A case brought by the BHA against the NPS (also involving the NY State government and NY State parks) relating to the misuse of an area of Empire Fulton Ferry State Park (EFFSP) with two 1860s historic warehouses. The city government intended to use areas of that park to stimulate private development in the adjacent Brooklyn Bridge Park (BPP) project. To circumvent legal restrictions, the EFFSP was split into two parcels, one for the warehouses and another described as "open spaces". Both parcels were then conveyed in a 99-year ground lease to a defendant Brooklyn Bridge Park Development Corporation (BBPDC). Furthermore, in support of these maneuvers, NPS submitted a report endorsing the modification of the limits of the park, claiming the warehouses had erroneously been included as part of the park, since the "former warehouses are not suitable for recreational use by the public, the pre-existing warehouses should have been excluded". An attempt was made to remove the "historic landmark" designation from the warehouses (see Federal Court Stops Bloomberg Plan to Give Structures in Brooklyn Bridge Park for Private Development. (http://awalkintheparknyc.blogspot.com/2011/04/federal-court-stops-bloomberg-plan-to.html).

    After numerous communications among the parties, including NYC, which sought to participate in the process given its interest in the parks and planned developments, plaintiffs filed an action seeking a temporary restraining order and/or preliminary injunction. The Court denied the temporary restraining order but signed an Order to Show Cause setting a hearing date on plaintiffs' motion for preliminary injunction. Initially, it was understood that the parties had reached an agreement.  Following an apparent obstacle in settlement negotiations, a second injunction request was filed. NPS issued a decision, providing a revised map of the park, doubtless under pressure by New York government agencies, stating that "the revision of the boundary map was the correction of a mistake, as the [NY State Parks] never intended to include the [warehouses] on the map when it applied for and subsequently closed out the LWCF grant, and, second, that NPS has the inherent authority to make such revisions..."

    United States District Judge Eric N. Vitaliano rejected the arguments from NPS, the City, and the other defendants. "The house of cards erected by the defense cannot withstand the gentlest breeze". The Court pointed out that LWCF regulations contain no allowance for a "revision" or "correction" to boundaries other than through the conversion process. It added that the statute is not silent about revisions; it flatly contradicts the NPS claim of power to correct "oversights" after a grant closes. Any change to the park areas after the close of an LWCF grant, regardless whether that change is referred to as a "revision" or "correction,"  triggers the conversion process and requires the full consideration of alternatives and, if needed, the substitution of a replacement property.

Therefore, the court ruled that "For the foregoing reasons, plaintiffs' motion is granted, and an injunction is entered and shall remain in effect for the pendency of this litigation, to the following effect: IT IS ORDERED that the ... decisions of NPS regarding the revision and/or correction of (boundary) for grant 36-01225 are set aside; ... it is further ORDERED that defendants, their agents, servants, employees, and all persons acting in concert with them or under their direction who receive actual notice of the injunction, are enjoined from undertaking any drilling, boring, or other alteration or construction on the Empire Fulton Ferry Park ..." (https://casetext.com/case/brooklyn-heights-association-v-national-park-service).

- **(Case 8) Boston Redevelopment Authority (BRA) v. National Park Services (NPS) and Sally Jewell.**
    This case pitted two government agencies against each other in a prolonged, bitter battle. The BRA wished to develop a piece of waterfront real estate (the "Pavilion") for commercial purposes. It had, however, taken a LWCF grant for that area in the 1980s. The National Park Service (NPS) became aware of that project and filed a claim to stop it. Initially, BRA maintained that the particular area in question was outside of that for which grant funds were used. This failing, BRA then argued that: 1. that NPS's decision was not an agency action subject to the Administrative Procedure Act (APA) but, instead, *an ultra vires* "attempt to encumber land." It also implied that the traditional APA standard of review did not apply to claims brought under either the LWCF Act or the Declaratory Judgment Act, and 2. that the funds were not used for "acquisition or development" but only for "planning." The US Court of Appeals, District of Massachusetts, ruled as follows: "To begin, the distinction between acquisition and development, on the one hand, and planning, on the other hand, is artificial. Section 6(f)(3) is the "cornerstone of Federal compliance efforts to ensure that the Federal investments in [LWCF] assistance are being maintained in public outdoor recreation use." The BRA's interpretation of the LWCF Act would permit grant recipients to chip away at this cornerstone. For example, grant recipients could skirt Section 6(f) entirely by allocating their LWCF stipends wholly for 'planning' rather than for acquisition or development. We refuse to read such a gaping loophole into the statute. The BRA's substantive due process argument fares no better. Far from being an unauthorized taking, NPS's determination that the Pavilion area could not be developed for commercial purposes was entirely consistent with both the terms of the LWCF Act and the project agreements. When a party applies for and receives a federal grant, there is nothing either unfair or unconstitutional about holding the grant recipient to the terms of its bargain." In the same manner, having accepted Papago Park with numerous and clear deed restrictions requiring it be used as a park, and having taken funds earmarked for outdoor public recreation, there is nothing either improper or illegal about holding the recipient of those lands and funds to the terms of its bargains.

- **(Case 9) *Friends of the Shawangunks, Inc. v. Clark* (754 F.2d 446 (Cir.2d, 1985))**
    In this case, the Marriott hotel and resort group committed itself to a significant investment to develop a resort facility, including a professional golf course. After an initial action was rejected, the Friends appealed this judgment to the US Court of Appeals. As characterized by the federal appeals court, "[t]his case presents the novel question whether amendment of a conservation easement acquired in part with federal funds under the Land and Water Conservation Fund ACT of 1965 as amended, so as to permit expansion of a golf course with limited access constitutes a conversion 'to other than public outdoor recreation uses' under section 6(f)(3) of the [LWCF] Act, 16 USC §460l - 8(f)(3)." Accordingly, the appeals court acknowledged that "Conservation may include, though it is by no means necessarily limited to, the protection of a present resource in its natural state." It is after all a "conservation" fund Act... Indeed, the Act's stated purposes include "preserving" the "quality" of outdoor recreation resources (16 USC §460l-4). The focus on preservation reappears in section 460l -9(a)(1), which authorizes allocation of funds for federal acquisitions both to protect endangered and threatened species and, by reference to section 460k-1, to protect "natural resources." As a result, the Appeals Court, contrary to the District Court's holding, concluded that

"the easement area presently is used for 'public outdoor recreation uses,' as that term of art was conceived by Congress and has been interpreted by the Interior Department." Considering this determination, the Appeals Court then had to consider "whether the amendment at issue here constitutes a 'conversion' of that easement to other than outdoor, public, recreation uses within the meaning of section 6(f)(3)." It concluded that it did constitute a violation of LWCF conditions.

With regard to the work in progress and expenses incurred, the Court added that

> "Unfortunately, or fortunately perhaps, the courts do not control the process, let alone establish it. When one undertakes to develop for private purposes a project involving the use of lands encumbered by a government interest, one's expectations are, or should be, that a certain amount of process and expense will be involved; presumably the anticipated rewards offset the cost and hassle, though surely the ultimate consumer will pay the cost of the benefit the process achieves, or there will be a hole in the developer's pocket."

- **(Case 10)** *Citizens to Preserve Overton Park, Inc. v. Volpe* (1971)

    In a landmark case, the US Supreme Court ruled 6-2 to overturn a decision allowing a city of Memphis to build a 6-lane highway through Overton Park (TN). The court noted that if the only factors for a decision were economic costs and the potential difficulty of relocations and of finding other sites for use, then parks would always be the most attractive targets for highway construction (and other uses) and "Thus, if Congress intended these factors to be on an equal footing with preservation of parkland there would have been no need for the statutes." This case signified the beginning of public interest litigation on environmental issues. Title 43 U.S.C. Section 138 was amended to read "It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites or development."

- *(Case 11) Jersey City v. Dept. of Envir. Protection.* (545 A.2d 774, 227 N.J. Super. 5, 1988)

    This case involves a sublease of about 50 acres of Liberty State Park by Department of Environmental Protection (DEP) to a private corporation for development of a public marina. The court rejected all legal challenges, ruling that department had the authority to grant rights or privileges to individuals or corporations for the construction, operation and maintenance for private profit of any facility, utility or device upon the State parks and forests, lands and waters as the department shall find necessary and proper for the use and enjoyment of the lands by the public; that the 1977 Master Plan included a large marina project and boat slips; that there was no violation of the "public trust" doctrine in that the marina will be open to the general public on a non-discriminatory, first-come-first-serve basis; that creation of a marina is an acceptable implementation of the expressed recreational pursuit of "boating" (also present in many national parks); that, while the Court was sympathetic to the plaintiffs' claim that the marina development plans may be targeted for the more affluent segment of society's recreational users, it believed that the $150,000/year rent plus a fixed percentage of marina receipts (9% or 12%) and development of the park would provide in the end for the use and enjoyment of all economic classes; and that DEP had not delegated any public authority... but retained all necessary residual authority to guarantee that the development proceeds in the public interest. These controls included DEP's final authority over (a) the Marina Design Plan, (b) the Marina's Management Plan, including berthing policies and fees, (c) all uses of the Marina's land and water areas, (d) Marina Insurance, (e) assignment of rights, (f) inspection of work, (g) termination of the lease and subleases, (h) regulation of public access, and (i) restriction of private development of nearby areas. Note that, unlike in the case of Papago Park, the marina was in the Master Plan, the local authority did not relinquish all control over public property, that boating is an accepted recreating activity, the financial conditions of the lease provide a direct monetary benefit to the local authority while serving the public, and, most of all, the marina is open to the general public.

In all cases researched by the Plaintiff, land declared to be park, deeded to be a park, having received funding as a park and used as a park, must, in the eyes of law, remain a park – not a child care center, not a parking lot, not a school, not a skating rink, not a golf course, and definitely not a private baseball camp. Even without deed restrictions or the constraints of LWCF funding requirements, a park is a public trust to be cherished for the common good and to be preserved for future generations.

## III.G. Arguments for Injunction

### III.G.1. The communication from the Solicitor's Office of the Department of the Interior (DOI) contains erroneous information; the revisionary provisions and use restrictions do not expire.

a. The Plaintiff had requested from the DOI a review of our position (see emails of July 16 and October 22) regarding title covenants and use restrictions. On October26 (see email) we received notice that, in the opinion of the Solicitor, all limitations had expired in 1984 and the US had no interest in any way in Papago Park.  This was based upon wording in the Certificate of Approval of Transfer No. 4, dated January 1, 1960, sent by the Solicitor, which stated that all reversionary provisions and restrictions would expire 25 years after the patent was issued (i.e., 12/31/1984).

b. A verification of US Code revealed that Public Law 86–292 of September 21, 1959 had repealed the twenty-five year limit in 43 US Code §869 (Conditions of transfer by grantee). The fact that the time limit had been removed, making the restrictions and provisions permanent, and that the document sent to the Plaintiffs with the expiration clause was signed after the clause's repeal, was brought to the attention of the Solicitor on October 29, 2020.

c. The Solicitor then replied on November 6, 2020, saying it made no difference because the patents had been issued prior to the time of the repeal and the 25-year limit was therefore valid for those titles and that the repeal would only apply to future patents. This is a misunderstanding of the repeal mechanism, which invalidates prior statutes unless there is a 'saver' clause, which was not the case (Note, for example of 'savings,' see the Recreation and Public Purposes Amendment Act of 1988,  Public Law 100-648, which has an explicit "Saving clause" applicable to certain items in previous legislation). It is unclear why the word 'future' was gratuitously inserted into the opinion of the Solicitor, because it is not in any statute.

d. The DOI failed to consider the deed restrictions and reversionary provisions included in two Title Documents issued after repeal date, not including the 1960 Certificate of Approval of Transfer No. 4. Note also that the 1997 Land Patent, issued by the United States of America, reaffirms those use restriction and non-compliance conditions even after all limitations had supposedly expired on December 31, 1984.

e. Note that there was a requirement in 43 US Code §869 (Disposal of lands for public or recreational purposes) of 1926 cited by the Solicitor, that lands disposed not be of "national significance."  Furthermore, it also states that "Nothing in sections 869 to 869-4 of this title shall be construed to apply to lands in any national forest, national park, or national monument, or national wildlife refuge, or to any Indian lands."  Papago Park, then called Saguaro National Monument, was therefore, by definition, a land of national significance and, subsequently, excluded from the provisions of the Act invoked by the Solicitor.

f. The BLM's own information sheet states the following: "Department of the Interior regulations for the Recreation and Public Purposes Act are found in Title 43 of the Code of Federal Regulations (43 CFR), Part 2740:  A. Patents: Patents issued under the Recreation and Public Purposes Act convey a restricted title since they contain certain provisions or clauses which, if not complied with, may result in reversion of the title to the United States. These provisions are: 1. Certain nondiscrimination clauses… 2. If the patentee or its successor in interest attempts to transfer title or control over the land to another, or the land is devoted to a use other than that for which it was conveyed without the consent of the Bureau of Land

Management, title will revert to the United States. 3. A stipulation that the lands will be used in perpetuity for the purposes for that they are acquired (but can be modified with BLM approval) (https://www.blm.gov/sites/blm.gov/files/LandTenureRecandPublicPurposesAct_InfoSheet.pdf). Yet, despite clear evidence to the contrary, the Solicitor told the Plaintiff that the use restrictions and reversionary provisions have expired, and the US has no interest in the matter.

g. Even if all federal provisions were to magically disappear, the City of Phoenix would still be obligated to abide by the very same title restrictions and revisionary provisions in the 1964 Deed of Sale, from the State of Arizona, which are unaffected by federal law or provisions.

h. So, if the restrictions and provisions continue to be in effect, and there is no expiration date, and there has been no authorized 'change of use', the United States of America and the Secretary of the Interior, by its own admission, must enforce the use restrictions in the covenants and the exercise the reversionary provisions in the Title Documents. Thus, in theory, the United States of American should claim title to and ownership of Papago Park.

III.G.2. All titles and deeds contain clear and unambiguous deed restrictions, declaring that Papago Park lands are to be used as a park, for public leisure and recreational purposes.

a. The 1930 Act abolishing Papago Saguaro National Monument (46 Stat. 142; HR 5672 Chapter 107) states that the US has "granted certain lands for municipal, park, recreation or public convenience purposes."

b. The 1937 Land Grant and Patent of Transfer (pages 37-39) from the US Government to Arizona, signed by F. D. Roosevelt, states "this patent is issued upon the express condition that the lands so granted will be used for municipal, park, recreation, or public-convenience purposes" (page 39). This restriction is included in the 1959 Certificate of Approval of Transfer, signed by the Secretary of the Interior, with authorization of a stadium (page 40).

c. The 1937 Title Documents is a "Land Patent". A land patent is an exclusive land grant made by a sovereign entity, in this case the US Government. An official land patent is the highest evidence of right and interest to a defined area, established by an Act of Congress. The rights and restrictions inherent in patented land are carried from heir to heir, heir to assignee, or assignee to assignee, and cannot be changed except by law.  As in the case of the day center cited above (Case 1, H.R. 2288 and H.R. 954), an Act of Congress may be required to remove certain covenants that run with the land.

d. In the 1997 Land Patent and Transfer Confirmation (pages 41-43) from the US to Phoenix the land usage is described as "for City park only".

e. The 1964 Deed of Sale (pages 44-49) from the state of Arizona to Phoenix, states in item (4) that "this deed is issued upon the express condition that the lands so conveyed shall be used only for municipal, park, recreation, or public-convenience purposes" (page 46). "Municipal purposes" is expressly defined as permitting the construction of a baseball stadium.

f. The 1964 Deed also recognizes and specifically authorizes seven leases within park lands (page 46). These are: 1. Arizona Fish and Game department (Later, the Zoo), 2. SRP, 3. Arizona Highways Dept, 4. City of Tempe, 5. Arizona Cactus and Floral Society (Botanical), 6. The Army (National Guard) and 7. Highway rights-of-way.  These seven leases still exist today.

g. The use restrictions and lease authorizations in the 1964 Deed are repeated verbatim in the 1964 Certificate of Purchase (pages 50-54).

h. Article 18.2.6 (e) of the Lease states that Phoenix has no knowledge of any restrictions, claims or reservations that would affect the Facility, yet these are all clearly present in the Full Lease, in Exhibit E (the Title Documents, pages 37-54).

i. On the National Park Service website, in pages relating to transfer of park lands to other jurisdictions, it is always stressed that those lands must remain public parks in perpetuity. Since 1926, the preservation of park lands for public use and enjoyment has been a clear, consistent

and continuous policy of the Department of the Interior.

**III.G.3. Validity of Deed Restrictions.** There is a long line of Federal and Arizona cases affirming the enforceability of deed restrictions, including those on former NPS lands. In fact, not one case was found that disregarded those restrictions.

a.  Article 4, §3, Cl. 2 of the Constitution provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States." The power over the public land thus entrusted to Congress is without limitations (*United States v. Gratiot*, 14 Pet. 526, 537), and "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine." Thus, Congress may constitutionally limit the disposition of the public domain to a manner consistent with its views of public policy. (*Light v. United States*, 220 U. S. 523, 537).

b.  Title restrictions on federal lands endure for decades after a grant or patent is issued, even in case of change of ownership or use. In *Oregon & California R. Co. v. United States* (case 4 above, in judicial precedents) the Court held that "Acts of Congress granting lands are laws as well as grants, and are operative until repealed; the fact that the conditions imposed in the grant were not applicable to the character of the lands furnishes no excuse for antagonistic action, even though it might justify nonaction pending further legislation... The delay in the assertion of a right is not conclusive against its existence". The Attorney General was empowered to assert all existing rights and remedies, including the claim on behalf of the United States that the lands granted by such acts, or any part of the lands, have been or are forfeited to the United States by reason of any breaches or violations of the terms or conditions of either of such acts which may be alleged or established in such suits, actions, or proceedings.

c.  To better understand the gravity of deed restrictions on lands belonging to National Parks, consider the 1989 case of a surplus 3-acre NPS parcel conveyed to Rockingham County, Virginia for use as a park (Case 1, above). The county, however, decided that a 1-acre portion of the land could be better used as a facility for 100 children by a non-profit. To remedy this, in 1990 Congress passed H.R. 2288 (on a 407 to 0 vote) and enacted Public Law 101-479 to allow for a portion of the land to be used for the childcare center. The Act removed restrictions from a portion of the property, while the other 2 acres continued to be subject to existing restrictions and reversionary clause. It takes a law or act of congress to change a law or a deed restriction.

d.  In 1931, the Arizona Supreme Court affirmed the enforceability of restrictive covenants (*Continental Oil v. Fennemore*, 38 Ariz. 277, 299 P. 132). Arizona courts have also ruled that restrictive covenants are enforceable as contracts. "When a grantee accepts a deed containing restrictions, he assents to these restrictions and is bound to their performance as effectively as if he had executed an instrument containing them (115 Ariz. at 333, 565 P.2d at 210).

e.  In *Federoff v. Pioneer Title & Trust Co.* (166 Ariz. 383, 1990) The Arizona Supreme Court ruled t "We hold that the restrictive covenants established by the original grantors are enforceable as class three covenants... that run with the land. The fact that they are not listed in subsequent grantees' deeds is not fatal to their enforcement." The equitable defense of changed economic conditions was raised at trial, and the Trial Court found economic infeasibility as to one of the covenants. The Court of Appeals reversed, stating that a change in economic conditions making it unprofitable to continue to enforce the covenant is not sufficient to find it unenforceable. Therefore... the covenants are enforceable as recorded, and in the opinion of that court, "even when original restriction are omitted from later property transactions, the initial restrictions are still valid and enforceable, and changed economic conditions are irrelevant".

f.  There is a long legal history affirming the seriousness and enforceability of land restrictions in state courts, where most notable cases are tried. *Powell v. Washburn* states "Such restrictive covenants are effectively contracts, interpreted to give effect to the parties' intent by reference

to the language of the covenant, the surrounding circumstances, and the purpose of the covenant." *O'Malley v. Cent. Methodist Church* places "heavy emphasis" on the language of the writing itself because, to the extent intended to bind successors in interest, the recorded covenant "is often the primary source of information available to a prospective purchaser of the land" and thus "should be interpreted to accord with the meaning" (see A.R.S. §33-440(A)(1)).

g.  The general rule of law is that deed restrictions on property are always valid and enforceable with the exception of restrictions that violate other previous covenants, those that are discriminatory (under Civil Rights legislation) or when there is a long and verifiable history of them being disregarded in comparable properties.  None of these are the case for Papago Park.

### III.G.4. Violation of the Land and Water Conservation Fund Act and Federal Property Act, Title 40.

a.  Both of these Acts by the US Congress deal with the preservation of park lands, particularly those formerly belonging to the National Park System (NPS) and/or administered by the Bureau of Land Management (BLM), in the case of Title 40 lands, and lands receiving funds for conservation, restoration and enhancement, in the case of the LWCF.

b.  The City of Phoenix received a Land and Water Conservation Fund (LWCF) grant in 1968, in the amount of $105,000 to "develop access roads, parking areas, hiking and riding trails, picnic areas in Papago Regional Park". This was approved on 3/2/1966 (Department of the Interior and related Agencies Appropriations, H.R. 17354, page 1396 and http://www.noia.org/wp-content/uploads/2013/03/23735.pdf). LWCF legislation mandates that "no property acquired or developed with assistance under this section shall be converted to other than public outdoor recreation uses" without approval of the U. S. Secretary of the Interior (16 U.S.C. § 460l-8(f)(3)) and that approval (of conversion) will depend on finding a substitute recreational property of at least equal fair market value and of reasonably equivalent usefulness and location.

c.  Phoenix violated not only the deed restrictions, but also the LWCF Act, as above, by effectively giving park property to a third party and permitting it to be used for a non-public, non-outdoor and non-recreational purpose. Phoenix also violated 40 US Code §550 (e)(4) (Disposal of real property for certain purposes) requiring that such property – former federal lands – "be used and maintained for the purpose for which it was conveyed in perpetuity. In the event that the property ceases to be used or maintained for that purpose, all or any portion of such property will in its existing condition, at the option of the United States, revert to the United States."

d.  Phoenix was aware of the restrictions on deeds and grants yet proceeded with the transfer of park lands to a non-public entity. In fact, its own websites states "LWCF is a federal grant program which preserves public outdoor recreation in perpetuity. LWCF allows assisted sites to be 'converted' when a non-recreational use on the LWCF site is proposed. Conversion is a procedure which replaces the LWCF site with another appropriate site for public outdoor recreation use" (https://www.phoenix.gov/parks/parks/alphabetical/l-parks/los-olivos-park).

e.  Also, the "Public Notification for Sale or Disposition of Parkland" in the Phoenix Parks and Recreation Board Policy, Number 3.8 item 1, adopted 4/25/2013, states that "PRD (Parks and Recreation Department) staff will prescreen the feasibility of the land sale (or disposition), which includes but not limited to, deed restrictions, grant restrictions such as the Land and Water Conservation Fund (LWCF) dollars, preservation designation, impact fee program, and/or donor restrictions, impacts to the community within the park service area…." If it is determined that there are deed or grant restrictions to acquire or develop the subject parklands, PRD staff will also complete Checklist B."

f.  For a better understanding of the legal implications of a LWCF grant, see the case of Cardiff School District and Berkich Park (Case 2, above). The School owned the adjacent park, without deed restrictions, and wanted to rebuild the school.  LWCF monies had, however, been used in

prior years to enhance the park. A local "Save the Park" group not only stopped construction using LWCF protections, but made the District pay $500,000 of its legal fees, beyond the $850,000 the District incurred for its own legal services – and left a half-demolished school.

g.  On August 4, 2020, the 116th Congress of the United States passed Public Law 116–152 "to provide permanent, dedicated funding for the Land and Water Conservation Fund". The bill passed the Senate by a vote of 73–25 and the House on a bipartisan vote of 310–107. The Associated Press called the Act "the most significant conservation legislation enacted in nearly half a century. The conservation of public parks and provision of recreation opportunities should be a priority at all levels of government. Unfortunately, this is not true.

h.  After refusing to take action relating to misuse of lands intended for park purposes, even in face of clear evidence of contractual transgressions and abuse of public properties, the Solicitor suggested that the matter of LWCF violations be submitted to the Arizona State Parks board for review. Pursuant to Section 6(f)(3) of the LWCF Act and 36 CFR 59.3, post-completion responsibilities for areas receiving LWCF funds, regardless of the extent of participation in the assisted area, rests with the State (https://www.nps.gov/ncrc/programs/lwcf/manual/lwcf.pdf).

i.  On November 9, the Plaintiff sent an email to the Arizona State Parks board, addressed to the official indicated by the Solicitor, with detailed information about alleged LWCF violations. On November 10, a response was received, saying they would consider the matter. More than a month has passed, and no further communication has been received from that agency. Sadly, this is par for the course. Officials at all levels do not want to get involved, no matter how indisputable the evidence, no matter how clear the law, no matter how important the issue.

### III.G.5. Absence of a "change of use" clause for the baseball training Facility.

a.  Upon acquiring Papago Park, state and local officials believed it to be of public interest to build a baseball stadium in the Park. Insomuch as this was understood to be outside the scope of permitted uses, it was incorporated into both the 1964 Deed of sale and the 1959 Certificate of Approval of Transfer, signed by the US Secretary of the Interior.

b.  Note that approval for construction was obtained from both the US and Arizona. This stadium, located at Van Buren and Gavin Parkway, was built, managed and operated by the City of Phoenix, and was for many years was used by the Oakland As team, with public access for practice and games. It is currently used by Arizona State University.

c.  No relief from the deed restrictions was sought for building the Giants' training Facility; nor were any "Change of Use" authorizations obtained from the Secretary of the Interior to modify or remove use constraints. Even if obtained, this use would have still been an infringement of the deed covenants, given the nature of the contracts and the activities occurring in the Facility.

d.  The stadium construction, done in the 1960s, was conducted in a manner quite different from that of the Lease and Sublease signed for the Giants' facility. The scope of work being done at the Facility, its purpose and the extent of the use privileges conferred to the Giants are in no way analogous to those specified in the 1958 and 1959 documents relating to the stadium Note that Wikipedia defines the word 'stadium' using terms like 'outdoor' and 'spectators'.

### III.G.6.  The Lease and Sublease for the Facility are not among those enumerated in the 1958 Deed of Sale and authorized by the US Government and State of Arizona.

a.  The 1964 deed for Papago Park explicitly says, "The lands are subject to the following leases" and enumerates the seven permitted leases identified in item III.G.2.f above. The City of Scottsdale and the Giants are not among those entities. Note that all these listed entities are non-profit, public utilities and government organizations.

b.  In none of the deeds, titles and patents relating to Papago Park is there any mention of a power for the leasee to sublease and assign. While the absence of such authorizations does not immediately negate this possibility, the City of Phoenix, by including the power to sublease in

the contract with Scottsdale, implicitly recognizes the need for consent from the leassor to execute a sublease arrangement (recitals, item D, page 1 and article 14.1, page 25).

c. While there may be lease agreements for food services or souvenirs ("concessions") in some of the seven permitted leases (particularly the Zoo and Botanical), it is doubtful that these enjoy unrestrained jurisdiction over their premises, much less the right of "Quiet Enjoyment" or the privileges derived from the joinder clause.  Note that 'concession' is defined in the Phoenix city code as "a revenue contract that provides goods or services <u>to the public</u>" (Sec 43-8).

### III.G.7. The Lease is mischaracterized and deceptive. It is not a lease of a facility.

a. The nature of the construction of the facility was misrepresented. In Article 1.1 of the Lease, the undertaking is referred to as "substantial improvements to the facility".  In the Sublease, item B (Recitals), the contract allows the "Giants to construct certain improvements". The fact is that these descriptions are inconsistent with the work in progress, which is a case of "bulldoze everything, scrape the land, clear vegetation, and build a huge new facility" (see email of September 28, comparing *Old v. New* facilities).

b. Local residents were under the impression that the Lease and Sublease, as presented by the two cities in public meetings, was nothing but a remodel of a very modest and inconspicuous group of fields and small buildings that was the old baseball area, not too different from the adjacent softball fields.  As one local resident said "We thought they were going to slap on a new coat of paint and then hang a 'Giants' shingle over the entrance. We had no idea that they were going to tear the whole thing down and destroy everything."

c. Not only is the new Facility much larger and more obtrusive than the previous installation, it is out of place and inconsistent with the visual standard of a desert park (email of June 24).  There is one large building often referred to as a 'used tire warehouse' that is at the very entrance of this new Facility, for maximum visual disruptive effect on the scenery (see email of June 26).

d. Sports media has published articles by Giants' staff saying they will build the Facility "from scratch" and that "you don't have to work around existing facilities" (see email of February 12 for article and email of June 24 for images).

e. There is nothing in the Lease or Sublease that gives the Giants the right to build an entire new facility.  There was no remodel or even improvements – both contracts are deceitful regarding the object of the Arrangement (see email of August 3 to AZ Parks Board about devastation).

f. The layout of the Facility has changed at least 4 times in the last year. The Facility, as being built, is not that specified in the November 2018 Lease contract, exhibits B, C and D (see emails of February 12 and July 24).

g. The Plaintiff was unable to verify if reviews were done and permits were obtained from the City of Phoenix for these changes. Also, the area being build (41-45 acres) is in excess of the 36.75 acres identified in the legal description in the Lease (emails of July 16 and 24). Note that the area of the old baseball facility, torn down and bulldozed in early 2020, was less than 30 acres.

h. The object of the operation was not the old facility but the land itself.

### III.G.8. Transfer of Control and Quiet Enjoyment.

a. Not only is the Arrangement in violation of the permitted uses for Papago Park, it also constitutes an attempt to transfer control of a portion of a public park to a private corporation, forbidden in the Title Documents.

b. Note that, according to the 1997 Land Patent,  the reversion clause may be exercised when "the patentee or approved successor attempts to transfer title to or control over lands to another" (page 42) and "the grantee is hereby prohibited from selling or transferring or attempting to sell or transfer Papago Park" (page 49)

c. Article 23.21 of the Lease confers the right of "Quiet Enjoyment" to the Leasee. This is repeated

in the Sublease. In real estate legal terminology, the Quiet Enjoyment clause means that the tenant cannot be disturbed or prevented in any way from the full use of a property. This is nothing less full control over the facility and a part of Papago Park.

d. Article 1.1 in the Lease requires consent by the Giants for actions relating to decisions, waivers, approvals, disapprovals, notices and communications about the Facility involving Scottsdale. It says that none of these actions can be effective without joinder with the Giants.  The expression 'joinder' means joining a person (or entity) to another agreement as if such person was an original party to such agreement. This basically gives the Giants veto over those actions, and again, control of lands and decisions relating to the Facility in Papago Park.

The following arguments may not qualify as violations of Federal laws. They do, however, raise questions as to the propriety of the Arrangement and the ethical shortcomings intrinsic to it.  At the very least, they demonstrate a lack of administrative competence or something more devious.

**III.G.9. There is no indication of 'public use' of the baseball Facility in a public park.  Denial of Access**

a. The Lease states in Article 6 (Uses of the Facility; Maintenance) that "Scottsdale will have exclusive use of the Facility practice fields, the clubhouse, and any incidental uses associated with the clubhouse, batting cages, pitching mounds, offices … except that Phoenix may request the following annual uses of the Facility up to a maximum numbers of days or uses..".  The Lease then stipulates 4 youth clinics, 15 days of games and 11 days of use of hitting tunnels and half fields, with dates to be negotiated. The wording of the Lease Article 6 is convoluted and the 'Facility' in the Article probably does not refer to the training Facility in Papago Park.   The reason for the doubt as to what location is being referred to is because there is no such provision in the Sublease for these activities. The description above probably refers to use of the downtown Scottsdale Stadium, as per Article 2.33 of the Lease.  The word 'facility' is confusingly used for both the Downtown Stadium and the Papago Park training area.

b. There is no one definitive definition of 'park' or even 'public park' but all definitions use terminology referring to areas set aside for conservation or public enjoyment and leisure. The National Park Organic Act of NPS in 1916 defines the purpose of the NPS as "to conserve the scenery, and the natural and historic objects and wildlife therein and to provide for the enjoyment of the same.... In no way does the work in progress at the Facility meet any definition of 'park' or 'for public convenience'.

c. The Civil Rights Act of 1964, a landmark case that forms the basis for current anti-discrimination laws, not only prohibits discrimination or segregation on the ground of race, color, religion, or national origin, it also, in a broader sense, legislates against discrimination in places of public accommodation. By permitting a private corporation to build and operate a walled, enclosed, restricted-access facility on public lands, the Lease violates principles of how public properties, particularly parks, may be used. Section 201(a) states "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, and privileges, advantages, and accommodations of any place of public accommodation, as defined in this section."

d. Under common law doctrine a political entity is prohibited from undermining the public's right to use public property. A municipality is considered to hold the property [it owns or has acquired] as a fiduciary for the benefit of the public.

e. The Title Documents for Papago Park state that "the Grantee shall not charge an admission or exact a toll for entry into Papago Park. Any charges made at concessions or fees fixed for the use of facilities shall be reasonable" (pages 47).   Not to charge admission or an entrance fee to public lands is one thing, not to be allowed entrance to certain areas of a park because they have been allotted for the exclusive use of a corporation is more grievous.

f. In the diagrams and blueprints of the Facility to be built, attached as Exhibits B, C, and D (pages

30-32) of the Lease, there is no provision for public accommodation. Note also that there are no bleachers around any of the six baseball fields in the Facility for fans or the public.

g. Section 4 (f)(8) of LWCF legislation states discrimination on the basis of residence, including preferential reservation or membership systems, is prohibited (except for some reasonable differences in fees on the basis of local residence). A 'staff only' closed, restricted access private compound is the ultimate membership system.

h. Not all government-owned property is open to the general public. Depending on the type of property, right to access public places may be constrained by reasonable time, place, or manner restrictions.  It depends on the type of property: parks are different from schools which are different from airports. However, parks, like roads, are considered open spaces, accessible to the public. There is no expectation of privacy in a public place, yet the lease confers the right of privacy and exclusive use to a corporation located within a public space.  So we have here a violation of the First Amendment of the US Constitution that guarantees freedom of assembly in public spaces and a perversion of the Fourth Amendment, by which the Lease confers privacy to a corporation in a place where no privacy is to be expected. The Facility cannot be both a public park and a private corporate enclave.

**III.G.10. The nature of the Phoenix-Scottsdale-Giants arrangement is unclear and does not conform to normal business practices.**

a. In neither the Lease nor the Sublease is there any reference to any section of the City Charter or City Code granting powers to engage in this type of Arrangement.  That in itself does not qualify the operation as illegal or illegitimate in any way. The Lease, being an intergovernmental agreement as defined in Section 43-2 of Phoenix City Code, is exempt from routine procurement rules for goods or services, and subsequently is also exempt from Section 43-37 criteria requiring 'best value' in contracts. It is, however, subject to the Arizona Revised Statutes §11-952 (Intergovernmental agreements and contracts) which in item c states "No agreement made pursuant to this article shall relieve any public agency of any obligation or responsibility imposed upon it by law." Thus, all parties are equally subject to state and federal laws, including those relating to park lands, former park lands and those receiving funding for parks.

b. The reason for Scottsdale to participate in this arrangement is perplexing.  Phoenix could have leased the facility directly to the Giants without an intermediary.  The triangular nature of the Contract and Subcontract is especially precarious for Scottsdale, in the middle and at risk of legal entanglements from both partners, Phoenix and Giants.

c. The Arrangement does, however, raise questions as to its purpose, and to what real advantages it brings to Phoenix. According to several news articles in local media, the main reason for the Lease was for Phoenix to relieve itself of the burden of maintenance costs for the old facility, declared to be $850,000/year.  By the same logic, every public park in the City of Phoenix, all of which incur operational costs, would available for sale or lease to third parties.

d. In the Lease, the nature of the contract is unclear since there is no reference to applicable legislation for that operation in the City charter, codes or ordinances. Under Phoenix city code (section 43-18), a contract must "promote the best interests of the City". The Lease is not a concession, because it does not provide goods or services to the public (Section 43-8).  Revenue contracts without competition or using an alternative method of competition are authorized (Section 43-40 c) when special circumstances permit, but must meet the criteria of 'best value' procurement. The Lease of the Facility meets neither the 'best interest' or 'best value' criteria.

e. If economic concerns of were of paramount importance, as Phoenix initially stressed, the Lease and Sublease are incomprehensible when considering market real estate values. For comparison purposes, current rental prices at nearby locations vary from $0.90 sf/yr for a large area (Rio Salado, and 101/202) to $5.28 sf/yr for a small lot (Washington and 32nd St). By

contrast, the yearly income derived from the lease of the baseball facility is $1,261 per acre/year, equal to less than $0.04 sf/yr, about 1/100ths of market rates. This is considering only the contractual 36.75 acres, not the 42+ acres occupied.  This is disconcerting.

f.   The rental income from the lease may be, in the vernacular, chickenfeed, but, to its credit, it is taxless chickenfeed, a better quality of fowl subsistence. Article 2.6 declares the Lease to be tax-free because baseball is a "government activity", of which few people are aware.

### III.G.11. Infringement of the Papago Park Master Plan

a.   Among the requirements stipulated in two Title Documents is to prepare and execute improvements according to a Master Plan. The Lease, in Article 1.1 (a), declares itself subject to provisions in "present and future building restrictions and regulations, master plans, zoning laws, ordinances, resolutions, and regulations of the City of Phoenix…" but only to the extent the same are enacted and applied uniformly to similar classes of property and similar uses.

b.   Article 18.2.6 (e) of the Lease states that Phoenix has no knowledge of any restrictions, claims or reservations that would affect the Facility, except that enumerated in Exhibit F, which is included in its entirety in the lease. Exhibit F is the 130-page 2010 Papago Park Regional Master Plan, with recommendations, elements and guidelines for development of the Park.  This Plan is vaguely referred to as "permitted encumbrances" and it is included in the complete Lease.

c.   There is no mention of building a training facility for a professional baseball team in the 2010 Master Plan nor is there any reference to expanding or leasing the existing old baseball facility.

d.   Phoenix has, over the years, as required by law, periodically prepared Master Plans, the latest being completed in 2010. These Plans have often been ignored or changed by a simple administrative vote by a Board, with little regard to the spirit and stated intent of the Master Plan.  A case in point is the unneeded Zoo parking lot, built in August 2020, which devastated 8-9 acres of desert (for a detailed explanation of the wanton destruction, see email of August 24).

e.   Phoenix has a long history of disregard for formal plans and rules intended to protect desert lands, not just in Papago Park but also in Preserve parks, areas supposedly protected by regulations incorporated into the City Charter. In Papago Park they have built ill-considered parking lots, moved boundaries, added facilities of dubious use, extended facilities into desert lands, and built unnecessary roads to satisfy concessions – all of these at the expense of desert habitat.  Much of the same has happened to Preserve parks (Phoenix New Times article: https://www.phoenixnewtimes.com/news/deconstructing-the-phoenix-mountain-preserve-6421649).

f.   Note that in the 2010 Master Plan includes a poll in which park users indicated that the number one desire of respondents was to protect undeveloped spaces.  The least desirable outcome in that poll was "more parking". So, what has Phoenix done in just the last 18 months?  Scraped three more areas of native desert vegetation to build parking lots.

g.   The *modus operandi* for the destruction of desert habitat is always the same: using the wording in the City Charter or Master Plan, officials declare an area suitable for *enhancement* or *essential* for a purpose and *voilà,* that area is available for development.

h.   These depredations and loss of native habitat are recognized as problematic by Congress. Quoting from *16 USC 470, Section 1, items 3 and 4: "*the historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency; the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations." This sentiment is reflected at all government levels, even in Phoenix park rules and city code. In the 2010 Master Plan, the Number 1 priority of visitors is to preserve desert landscape. Yet, despite this, the spoliation continues.

Rather than a simple matter of disdain for unoccupied open areas, the Leases and Arrangement

may also be viewed as matter of sanctioned favoritism and corporate power being leveraged to obtain benefits not available to the community. This is nothing less than a form of discriminatory and pecuniary redlining, excluding some people from public benefits due to their lack of influence and resources, while granting favored status to others for their possession of those attributes.

In an audit (Report No. W-IN-MOA-0008-2005 of April 10, 2007), the Office of Inspector General (OIG) found that the NPS and BLM had allowed private parties or exclusive clubs to monopolize desirable locations in public lands for decades through a mechanism entitled "Special-Use Permits.' These permit holders enjoyed preferential access to facilities, beaches, waterways, and scenic nature areas through restrictive and costly memberships that denied the general public the same benefits. Private clubs erected fences, charged membership fees in the hundreds of dollars, and required members to pay rental fees (up to $9,999,5 for a season in worst case) for cabanas, pool use, and parking.  One club even caped its dues-paying membership at 200, and required an applicant to have two member sponsors, a private interview, and Board of Director approval for membership. All of this occurred on public lands under policies and regulations approved by the agencies of the US Department of the Interior.  This type of abuse of the public trust is in no way different from of the City of Phoenix allowing a for-profit corporation to build and operate a private compound in a public park. The audit recommended that those agencies not renew special-use permits, to open all facilities to the general public, and to determine the appropriate legal instruments under which to operate those facilities. The moral of this story is that there is a tendency for public officials, over time, at all levels, to progressively accommodate and gratify elite elements of society through arrangements that are of unbecoming smugness, dubious legality and obvious moral malfeasance. This, the Plaintiff believes, is the only plausible explanation for how a private facility came to be built in a public park. Often, the only way to rein in such nefarious behavior is through judicial actions such as this.

### IV. Irreparable Injury

It is understood that that the *raison d'être* for a park is its recreational value – but this is just the tip of the iceberg. A study by the National Parks Organization establishes that over half of the parks' total value stems from "the public knowing that the parks and their assets are protected for current and future generations, regardless of whether they actually visit. This means that over half of the total value of our national parks is unrelated to benefits experienced directly by visitors. This non-use value can be broken down further into *option, existence,* and *bequest* categories. While some Americans choose to spend their time elsewhere, they still value having the *option* of recreation at our national parks. They might also feel what is defined as *existence* value – simply knowing that the parks exist to tell our nation's story, even if they don't personally use them. Finally, the study found that 95% of Americans value the preservation of national parks so they be can be used by future generations – also known as their *bequest* value. Remarkably, the option, existence, and bequest values account for more than half of our national parks' total economic value and make a strong case for their continued protection and stewardship... These concepts of value are important as we consider the worth of national parks not only in terms of the people who visit them, but just as significantly, for those who don't." (https://www.nationalparks.org/connect/blog/beyond-visit-how-we-value-national-parks). To empower a corporation to build a facility in a public park is to not only to deprive citizens present leisure options but to deny the same benefits to future generations.

A basic issue in this case is the unique status enjoyed by real property in our legal system.   In fact, in court it often has been said that 'land is unique' – it is immovable and place-specific, each parcel different in geography from any other. Within the complex field of land use law, that pertaining to public lands is of particular significance, and no aspect of public land holds higher eminence than that of the park. Public parks lands may be donated or bought, but they are never sold. Public parks cannot readily be valued by the usual appraisal methods or legally allowable proofs, thus special

protections exist to preserve their unique nature, or to prevent perversion of that nature, as is the case in extreme penalties embedded in the ownership documents pertaining to this case. In simple terms, a park cannot be given a monetary value. In certain cases, under the terms of specific legislation, park lands may 'moved' by substituting other nearby lands of equal usefulness and character. It is, however, difficult to imagine finding comparable properties to replace lost lands in this case. The loss of lands in Papago Park, even a part thereof, does irreparable harm to the community and cannot be corrected through monetary compensation.

The Plaintiff believes the only equitable remedy for this case is an injunction by the Court, requiring the defendants to simply obey the law. This legal relief is necessary to protect lands in the public domain that have been used for recreation and leisure for more than one hundred years. The absence of that action will signal the Court's acquiescence to – under unsavory circumstances – the removal of a large area of a public park, hitherto dedicated by law for recreation and enjoyment, from the public domain. It will also create a previously inconceivable and dangerous precedent in which federal laws pertaining to parks and related grants or restrictive covenants can be disregarded at will. Finally, if unchallenged, the devastation of desert flora and fauna and construction of a private facility in Papago Park may lead to similar abuses in other areas of that Park, or even other city parks.

## V. Relief

The Plaintiff believes it has done everything possible to avoid a confrontation of this nature. FOPP members have sent hundreds of emails about activities perceived as illegal and other actions that devastate desert habitat – while maybe not illegal – are contrary to the public's expressed desire to preserve natural spaces. They have asked for meetings and explained the issues in detail, with facts, legal citations and photographs. They even asked for a mere commitment from Phoenix not to destroy any more desert landscape – the answer to which was a bulldozing of 8-9 more acres of desert to build another unneeded parking lot (emails of August 24 and 31). All these efforts were in vain, leaving the Plaintiff with no other recourse than the extreme judicial measures specified in the Title Documents.

### Penalties

The penalties for violating the restrictive covenants and federal LWCF and/or Title 40 statutes are found in all Title Documents, with minor variations:

- **1930 Act to Abolish Papago Saguaro National Monument** (46 Stat. 142; HR 5672 Chap. 107) declares that the lands transferred shall be used "only for the purposes herein indicated, and if the said lands, or any part thereof, shall be abandoned for such use such lands or such part shall revert to the United States; and the Secretary of the Interior is hereby authorized and empowered to declare such a forfeiture of grant and to restore said premises to the public domain if at any time he shall determine that the State or city has abandoned the lands for the uses herein indicated, and such order of the Secretary shall be final and conclusive; and thereupon and thereby said premises shall be restored to the public domain and freed from the operation of these grants..."
- **1937 Land Grant and Patent of Transfer**: "and if the lands so granted or any parts thereof shall be abandoned for such use, such land, or such part, shall revert to the United States (page 39)
- **1959 Certificate of Approval of Transfer**: "This approval is subject to the reversionary provisions of the above act..." (page 40)
- **1997 Land Patent and Transfer to Phoenix**: "... the title shall revert to the United States, after opportunity for a hearing, that, without the approval of the Secretary of the Interior..." that the patentee or its approved successor attempts to transfer title or control over the lands to another, the lands have been devoted to a use other than that for which the lands were conveyed, the lands have not been used for a purpose for which they were conveyed for a 5-year period, or the patentee has failed to follow the approved development plan..." (page 42)
- **1964 Deed of Sale**: "the grantee is hereby prohibited from selling or transferring or attempting to sell or transfer Papago Park such action or attempted action by Said grantee shall be deemed an abandonment and Papago Park shall revert to the United States of America." (page 49)
- **1959 Certificate of Purchase**: "the grantee is hereby prohibited from selling or transferring or attempting to sell or transfer Papago Park such action or attempted action by Said grantee shall be deemed an abandonment and Papago Park shall revert to the State of Arizona." (page 54)

It is irrelevant that the infraction occurs only on a small area of a park; the entirety of the park is forfeit. Title 40 US Code §550(e)(4) (Disposal of real property for certain purposes) requires that parks "be used and maintained for the purpose for which it was conveyed in perpetuity. In the event that the property ceases to be used or maintained for that purpose, all or any portion of such property will in its existing condition, at the option of the United States, revert to the United States..." In this case, according to §102-75.690 (Property revested by reason of noncompliance) the DOI must notify the GSA when a title to property transferred for use as a park is to be revested for noncompliance.

It has never been the objective of the Plaintiff to sever the bonds of proprietorship between Phoenix and Papago Park that have existed for sixty years. The City of Phoenix and the Parks and Recreation Department have done many good things in this time. The plaintiff does believe, however, that over time, particularly in the last ten years, Phoenix has on too many occasions and for too few good reasons, sacrificed native desert flora and fauna – the very *raison d'être* of Papago Park – to build parking lots, extend golf areas, construct unneeded roads, add cement walkways, and so on – all of which always result in less desert habitat (See email of August 3 for images of this depredation).

The Plaintiff is aware that a full reversion of Papago Park would create an enormity of complex legal problems with the leasees permitted under the 1964 Deed of Sale and their concessions and suppliers, as well as in issues relating to park operation and maintenance. The jobs and paychecks of hundreds of park and project staff and subcontractors would be in jeopardy. It is also certain that a cancellation of the Lease and Sublease would result in lawsuits of the tens of millions of dollars by the Giants, the costs of which would ultimately be borne by the taxpayers of Phoenix and Scottsdale.

Perhaps a solution can be found through a meeting between interested parties – under the supervision of the Court. The 1959 Conditional Certificate of Purchase and the 1964 Deed of Sale allow the US to inspect the park at any time to determine if deed restrictions are being complied with. Unlike other Title Documents, which seem to require the immediate reversion of the park to federal hands, these documents stipulate a "one full fiscal year" period to resolve disputes regarding non-compliance. It is uncertain as to what actions would be needed for Papago Park to regain a "compliant" status, other than a demolishing of the Facility and a return of that area to its natural desert topography. This is exactly the scenario that the Plaintiffs had hoped to avoid when initiating protests in 2019, yet their admonitions were ignored, and the problem was compounded by the continued building and destruction of desert habitat. Both the Title 40 and LWCF Acts also contain provisions for land substitution, howbeit with stringent guidelines as to permissible alternatives.

**Relief Requested**

The Plaintiff therefore requests of the Court the following remedies:

1. The Court issue a Notice of Embargo of Construction, to the defendant and co-defendant, informing them that unless an agreement is reached, as below, construction at the Facility will halt and the reversionary clauses will be applied in the terms of the law. [1]
2. The Court convoke a hearing on the merits of this case, to examine possible courses of action. This would involve representatives of Phoenix, Scottsdale, the Giants, Arizona State Parks, the US Department of the Interior and the plaintiffs and, hopefully, lead to a plan of action agreeable to all parties, substantiated by law and approved by the Court, within a time frame established by the Court. Each agency or organization would be limited to three representatives.
3. The Court indicate a person or persons to mediate this meeting. [2]
4. While the Plaintiff recognizes that while the problem is complex, there are measures and options that could possibly alleviate the severe financial impact that would be imposed in the case of a prolonged disruption or cancellation of operations at the Facility and Park, with the caveat that any agreement on those measures and options must have the unanimous approval

of <u>all</u> parties. This would include, but is not limited to, those alternatives found in the Federal Property Act, LWCF legislation, or found in other related statutes and court cases.

5. What the Plaintiff cannot agree to is any proposal that will further diminish the remaining depleted areas understood to be desert Sonoran landscape. The Plaintiff's objective is the protection of the desert habitat in Papago Park, including, if necessary, in the absence of an agreement, the restoration of all areas devastated for uses inconsistent with Park covenants.

6. Given that the representatives of the Plaintiff are private citizens of modest means, and this injunction was forced upon them due to the depredations inflicted on a public park, the plaintiffs ask solely for a reimbursement of the filing fee for this legal action.

7. Should all parties in item 2 above not arrive at a consensus and agree to a plan of action within the allotted time, as mediated by the Court, then the only recourse left is to rigorously apply the sanctions in the Title Documents, under which the Facility would be demolished, the land restored to its pre-baseball-complex native state and ownership of the park would revert to the United States of America for public recreation purposes, as intended and as stipulated in all documents of conveyance for Papago Park.

Notes:
(1) It had been the intention of the plaintiff to request an immediate halt to all work at the Facility site. However, upon consideration of the costs incurred and, particularly, the effects on family incomes of workers, The Plaintiff is willing postpone this action in the hope that an agreement may be reached within the framework of the law.
(2) It had been Plaintiff's intention that a representative of the Secretary of the Interior mediate this meeting (email of 10/22/20. However, in view of the flawed information provided by that entity (Argument No. 1), and the continued stalling and disinterest shown by other government agencies, the Plaintiff believes the only fair, neutral judgment possible may be that of a judge in a court of law. The plaintiffs are also amiable to a trial by jury. .

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, we certify to the best of our knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

The representatives of the Plaintiff agree to provide the Clerk's Office with any changes to addresses where case related papers may be served. We understand that a failure to keep a current address on file with the Clerk's Office may result in the dismissal of this case.

12/23/2020        Lasse Norgaard-Larsen

12/23/2020        John Arthur Deal

**Date of signing        Printed Name        Signature**